UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MATTHEW MORALIS,

        Plaintiff,

        v.        No. 06 C 2034

JEAN FLAGEOLE and
MICHAEL DOWNEY,
        Defendants.

**MEMORANDUM OPINION AND ORDER**

        The plaintiff, Matthew Moralis has brought this *pro se* civil rights lawsuit pursuant to 42 U.S.C. § 1983 against the defendants, Jean Flageole and Michael Downey, in their individual capacities.  The plaintiff claims that Flageole and Downey violated his civil rights when he was denied adequate medical treatment for dental and mental health.  Before the court are the defendants' summary judgment motion [204], the plaintiff's response [216] plaintiff's declaration [217] plaintiff's additional summary judgment issues [218], plaintiff's additional summary judgment exhibits [219], plaintiff's counterstatement [220], plaintiff's additional information [221], plaintiff's medical exhibits/summary judgment [222], plaintiff's affidavit [223], plaintiff's memorandum of law [224], plaintiff's declaration in opposition [227], plaintiff's motion for leave to file amended summary judgment pleadings [228] and the plaintiff's amended counterstatement [229] and the defendants' reply [230].

        As the clerk of the court filed the plaintiff's amended pleadings [227] and [229] on February 26, 2007, the plaintiff's motion for leave to file an amended summary judgment pleading [228] is rendered moot.

        In their reply in support of their motion for summary judgment [230], the defendants argue that the plaintiff's response does not comply with Federal Rule 56.  The defendants are correct.  The court further finds that the plaintiff's response also does not comply with L. R. 7.1(D) and he does not meet the exception found in L. R. 7.1(D)(6) which provides that "Local Rule 7.1(D) does not apply to pro se litigants... upon a showing of good cause."  Plaintiff has not shown good cause for not following L. R. 7.1(D).  In the court's January 4, 2007 order the court stated the following:

> [T]he court notes that the plaintiff has presented documents to the clerk of the court that are in disarray. The court will not use its resources to put the plaintiff's documents in order and the clerk of the court, nor this court, will perform secretarial duties for the plaintiff. The clerk of the court is directed to strike the plaintiff's response 212 , affidavit 213 , exhibit 214 and memorandum of law (plaintiff actually submitted two documents titled memorandum of law), as well as several loose attachments that perhaps are exhibits, but are not clearly marked and numbered as exhibits, nor are these

> documents collated into clearly identifiable documents 215. The
> clerk of the court is directed to return the plaintiff's documents
> [212-215] to him. Further, the clerk of the court is directed to
> enclose alongwith this minute entry a copy of Local Rule 7.1(D)
> that discusses Summary Judgment motion/response/reply. The
> plaintiff is advised that although he proceeds pro se, he must
> comply with Local Rule 7.1(D). The plaintiff is allowed twenty-one
> days from the date of this order to submit a response to the pending
> summary judgment motion that complies with Local Rule 7.1(D).

The plaintiff was provided with a copy of L. R. 7.1(D) and given an opportunity to submit a response that complied with the rule. He failed to do so in his first response [212 -215] which was subsequently stricken (see court's 1/4/7 order), his second response [216-224] and his amended response [227, 229].

See Fed.R.Civ.P. 56(e) ("[T]he adverse party's response, by affidavits or as otherwise provided in this rule, *must set forth* specific facts showing that there is a genuine issue for trial.") (emphasis added); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' *designate* 'specific facts showing that there is a genuine issue for trial.'") (emphasis added).

United States District Court Local Rule 7.1(D) required the plaintiff, as the nonmoving party, to provide an "Introduction" without citations, briefly summarize the legal and factual basis for opposition to the motion and the exact relief sought.  Then plaintiff was required to submit his Response to Undisputed Facts, and in separate subsections state the (1) Undisputed Material Facts (2) Disputed Material Facts (3) Immaterial Facts and (4) Additional Material Facts.  The plaintiff was required to list by number each fact from the defendants' Undisputed Material Facts of the summary judgment motion which is conceded to be undisputed and material.  Further, the plaintiff was required to list by number each fact from defendants' undisputed material fact of the summary judgment motion which is claimed to be disputed.  Each such claim of disputed fact *must* be supported by evidentiary documentation, referenced by specific page.  The plaintiff was required to include as exhibits all cited documentary evidence not already submitted by the movant.  Plaintiff was also required to list by number each fact from defendants' undisputed material facts of the summary judgment motion that is claimed to be immaterial (if any) and the reason for such claim.  Finally, the plaintiff was required to list and number each additional material fact raised in opposition to summary judgment motion.  Each additional fact must be supported by evidentiary documentation, referenced by specific page.  The plaintiff was required to include as exhibits all relevant documentary evidence not already submitted by the movant.

Either rule violation could support summary judgment. *See* Fed.R.Civ.P. 56(e) ("If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."). USDC Local Rule 7.1(D) provides that:

> All motions for summary judgment and responses and replies thereto shall comply with the requirement of this rule. Any filing not in compliance may be stricken by the court. The consequences for failing to comply are discussed thoroughly in *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994). The court will assume that the facts as claimed by the moving party are admitted to exist without controversy, except as and to the extent that such facts are actually in good faith controverted in the 'statement of genuine issues' filed in opposition to the motion, as supported by the depositions, answers to interrogatories, admissions, and affidavits on file.

Further, pro se litigants are presumed to have full knowledge of applicable court rules and procedures. Therefore, although the plaintiff is proceeding pro se, he must follow the Federal Rules and procedural rules of the Central District of Illinois. *See Metro Life Ins. Co. V. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002). The defendants are correct. Local rules serve an important function in the summary judgment process. "Such rules assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a dispute fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 527, *citing Markham v. White*, 172 F3d 486, 490 (7th Cir. 1999). The Seventh Circuit has consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir.2000)(upholding the district court's decision to strike response in its entirety rather than selectively due to failure to comply with local rules); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir 1995); *Waldridge v. American Hoechst Corp.*, 24 F3d 918, 922 (7th Cir. 1994)(collecting cases).

The plaintiff has filed numerous filings in opposition to the defendants' summary judgment motion. The plaintiff's counter statements listing material facts contains generalized arguments and conclusion, rather than particularized statements of fact. His affidavit and declaration contain hearsay statements, as well as legal arguments and conclusion. Further, hundreds of pages of exhibits are not referenced in his counter statement. Plaintiff did not respond particularly to each numbered paragraph. He did not identify each fact from the defendants' statement of facts and clarify whether it is conceded to be undisputed and material, disputed and material or immaterial. The plaintiff's statement is wholly disjointed, contains evasive and contradictory answers, legal conclusions and argument. Further, his evasive denials do not fairly meet the substance of the material facts asserted and his citations to the record merely support legal argument rather than the controverted material facts. *See Bordelon*, 233 F.3d at 528. Further, additional facts beyond the movant's statement must be submitted in a separate subsection. *See* L.R. 7.1(D)(2)(b). The plaintiff did not list additional material facts in

opposition to the defendants' summary judgment motion. This court is not required to and will not wade through the plaintiff's improper denials, legal argument and unreferenced exhibits in search of a genuinely disputed fact. *See* Borden at 529. Smith *v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment state to paw through the assembled discovery material. 'Judge are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Bd. of Regents,* 2002 WL 31397690 (7th Cir. 2002), *quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Further, the plaintiff's affidavits and declaration do not comply with Fed. R. Civ. Pro. Rule 56(e) which requires that an affidavit in opposition to summary judgment "shall be on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testy to the matters stated therein. Further under Fed. Rule of Evidence 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Affidavits must present concrete facts; mere conjecture or speculation is insufficient. *Johal v. Little Lady Foods, Inc.,* 434 F.3d 943, 947 (7th Cir. 2006). Personal knowledge may include reasonable inference, however, the inferences must be grounded in observation or other first-hand personal experience. *See Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003). The evidence relied upon must be competent evidence of a type admissible at trial; thus a party may not rely on inadmissable hearsay in an affidavit to oppose a summary judgment motion. *Bombard v. Ft. Wayne Newspapers*, 92 F3d 560, 562 (7th Cir. 1996). Furthermore, legal argumentation is an expression of legal opinion and is not a recitation of fact, to which an affiant is competent to testify and therefore do not belong in a Local Rule 7.1(D) response. *Pfeil v. Rogers,* 757 F.2d 850, 862 (7th Cir.1985). It is also improper to manufacture a factual dispute through an affidavit containing conclusory allegations that contradict prior deposition testimony. *See Amadio v. Ford Motor Co.,* 238 F.3d 919, 926 (7th Cir. 2001).

The plaintiff's affidavit [223] is replete with speculation, argument and legal conclusions. *See* plaintiff's affidavit at pars. 6-9, 11, 12, 15, 18, 20-22, 23-27, 29-30, 33, 36, 37-38, 40, 41, 45-46, 48-50, Argument & Case Law, Proof of Damage, Casual Relations to Injuries, Conclusion. His affidavit contains statements not made on personal knowledge. *See* Id. at pars. 1, 3, 6, 11-12, 15, 17, 26, 29, 31, 38, 40, 45, 47. His affidavit contains hearsay statements. *See* Id. at pars. 3, 5, 14, 16 and 45. His affidavit contains statements that contradict the plaintiff's prior deposition testimony regarding his alleged suicide attempt, *see* Id. at par.44 and Moralis Dep., p. 17, and medical treatment, *see* plaintiff's affidavit at pars. 7, 8, 9, 29, 35, 46 and Moralis Dep. At pp. 39, 43-44, 47-50, 56, 60-61, 83, 85, 98-100, 104-108. In his affidavit, the plaintiff states that he "clearly received no care in regards to extreme pain and infections," and that all his requests for dental care were denied. However, in his deposition, the plaintiff testified that he saw the dentist on two occasions, received a medicated mouthwash on several occasions, received pain medication, anti-inflammatory medication and an antibiotic used to help treat periodontal disease. *See* Moralis Dep., pp. 39, 43-44, 47-50, 56, 60, 83, 85, 98-100, 104-108.

Further the plaintiff's separate declarations [217] and [227] are not based on personal knowledge and is wholly argumentative, speculative, based on hearsay, contradicts his prior deposition and contains legal conclusion.

In his Memorandum [224], the plaintiff does not directly respond to the defendants' argument in support of summary judgment. He merely recites case law relative to inadequate medical care and makes sweeping conclusions that his medical need was sufficiently serious and the defendants were deliberately indifferent. He does not discuss the law in light of the facts of this case, nor why the law and those facts should preclude summary judgment. L. R. 7.1(D)(2)(c) outlines the requirements of an adequate response to the argument section. The nonmovant is required to:

> With or without additional citations to authorities, respond directly to the argument in the motion for summary judgment, for example, by explaining any disagreement with the movant's explanation of each point of law, why a point of law does not apply to the undisputed material facts, why its application does not entitled movant to relief or why, for other reasons, summary judgment should not be granted.

The clerk of the court mailed a notice to the plaintiff setting forth Fed. R. Civ. Pro. Rule 56(3) requirements and provided to him a copy of that rule [207] on November 29, 2006. Then on January 4, 2007, the clerk of the court provided a copy of L. R. 7.1(D) to the plaintiff. The plaintiff's *pro se* status does not serve as a license to completely ignore the Federal Rules of Civil Procedure or the Local Rules. *See Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) ("[procedural] rules apply to uncounseled litigants"); *Downs v. Westphal,* 78 F.3d 1252, 1257 (7th Cir.1996)( "*pro se* litigants are not entitled to a general dispensation from the rules of procedure"). Therefore, clerk of the court is directed to strike the plaintiff's responses: [216] plaintiff's declaration [217] plaintiff's additional summary judgment issues [218], plaintiff's additional summary judgment exhibits [219], plaintiff's counterstatement [220], plaintiff's additional information [221], plaintiff's medical exhibits/summary judgment [222], plaintiff's affidavit [223], plaintiff's memorandum of law [224], plaintiff's declaration in opposition [227], and the plaintiff's amended counterstatement [229] to defendants' summary judgment motion, forthwith.

Now that the above is out of the way, the court will consider the defendants' summary judgment motion [204].

**Background**

In his amended complaint [38], the plaintiff claims the defendants were deliberately indifferent to his serious medical needs when: (1) they denied him adequate dental care although he suffered from extreme pain, periodontal disease, recurring infections on his upper and lower gums, inability to eat or sleep without severe pain, trouble chewing and extreme bleeding of his gums daily and (2) they denied him adequate mental health care when they denied treatment by a

qualified or licensed psychologist. Jean Flageole and Michael Downey moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Central District of Illinois Local Rule 7.1. The defendants assert that plaintiff's claims fail because there is no evidence that Flageole and Downey were, in fact, deliberately indifferent to the plaintiff's medical needs and that to the contrary, the evidence shows that they acted reasonably in attempting to treat plaintiff's dental and mental health conditions in light of the circumstances. Further, the defendants assert that they are entitled to qualified immunity because the plaintiff has not proven that they violated the plaintiff's constitutional rights and because the constitutional standards surrounding the plaintiff's claims were not sufficient to put the defendants on notice that their conduct was unconstitutional.

## Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992). Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986) and *Vukadinovich v. Board of Sch. Tr. of North Newton Sch. Corp.,* 278 F.3d 693, 699 (7th Cir.2002).

## Undisputed Facts[1]

1. The defendant, Jean Flageole is the head nurse at the Kankakee County Jail, Jerome Combs Detention Center, in Kankakee county, Illinois (Flageole Aff., para. 1).
2. The defendant Michael Downey is the Chief of Corrections in Kankakee County, Illinois (Downey Aff., para. 1).
3. The plaintiff, Matthew Moralis, who was in custody of the United States Marshals Service (hereinafter USMS) at all relevant times, was housed at the Kankakee County Jail from February 24, 2005, to March 10, 2006, pursuant to an Intergovernmental Service Agreement ("ISA") (Shaw Aff., paras. 2-3).
4. At all relevants times, Christopher Shaw served as the USMS liaison to the Kankakee County Jail (Id., para. 4).
5. Under the ISA, the Kankakee County Jail receives from the USMS a per diem fee for housing each federal inmate, which covers the cost of housing, food and all necessary on-site medical care (Id., para. 6).
6. All medical and dental treatment provided to a USMS detainee off-site is initially paid for by the Jail; the Jail is subsequently reimbursed by the USMS for any authorized treatment (Id., para. 9).
7. USMS policy provides that the USMS will provide USMS detainees with all medically necessary health care, generally through the local jail facilities under contract with the USMS (Id., para. 10).
8. In accordance with the ISA, the Kankakee County Jail is instructed to provide all emergency medical care to detainees immediately without USMS authorization. Prior authorization is only required in instances where non-emergency medical care must be provided at facilities outside the Jail (Id., para. 8).
9. USMS Publication 100 defines reasonable and medically necessary health care as being medical treatment that cannot be delayed until after the prisoner's judicial status is resolved, meaning until the prisoner is remanded to the custody of the Federal Bureau of Prisons or is released following acquittal, without health risk to the prisoner (Id,, para. 10).
10. The USMS will not authorize a request for non-emergency medical care at facilities outside the local jail when the treatment is not reasonable and medically necessary under USMS Publication 100 (Id.).
11. According to USMS Publication 100, treatment of pre-existing conditions, which are not life-threatening or medically necessary, should be delayed until after the prisoner's judicial status is resolved (Id., para. 14).
12. According to USMS Publication 100, periodontal treatment is not authorized for payment by the USMS (Id., para. 15).
13. According to USMS Publication 100, psychological or psychiatric testing, counseling or psychotherapy is not authorized for payment by the USMS unless ordered by the Court (Id., para. 16).
14. The USMS relies on the medical assessment of the local jail's physicians to determine whether a detainee is in need of medical attention, whether specific medical care is of an

---

[1]Exhibits can be found attached to Defendants' Statement of Facts [204].

7

emergency or non-emergency nature, whether the treatment can be postponed until the resolution of the detainee's criminal proceeding, and whether the treatment can be provided within the jail (Id., para. 11).

15. When a local jail determines that a USMS detainee may be in need of non-emergency medical care that cannot be provided within the jail and the treatment cannot be reasonably postponed until disposition of the detainee's criminal matter, the local jail contacts the USMC district offices for authorization (Id., para. 12).

16. USMS Publication 100 allows for an otherwise non-authorized treatment to be approved when an evaluating physician determines that a prisoner's condition would cause deterioration of his or her health or uncontrolled suffering if left untreated while in USMS custody (Id., para. 17).

17. In determining what may constitute a deterioration of health or uncontrolled suffering, such determination is made on a case-by-case basis by the evaluating physician (Id., para. 18).

18. When providing medical, mental or dental care for federal detainees, the Kankakee County Jail follows USMS Publication 100, Prisoner Health Care Standards (Downey's Answers P.'s Written Questions, Nos. 12, 13, 15, Exhibit D).

19. Inmates housed at Kankakee County Jail are provided on-site medical services by Dr. Clyde Dayhoff, Dr. Jeff Long, Physicians Assistant Kristy Patterson, and nurses Defendant Flageole, Laurie Eheart, Beth Harmon, Heather Gill and Deborah Dyer (Flageole's Answers Pl.'s Written Questions, No. 14, attached hereto as Exhibit F).

20. Inmates housed at the Kankakee County Jail are provided dental services for acute conditions off-site by Dr. John T. Peterson (Peterson Dep., p. 6).

21. On June 20, 2005, plaintiff submitted a request form inquiring as to whether the Jail had mental health services or if plaintiff could see somebody who deals with mental health issues (Moralis Dep., pp. 92-93).

22. Plaintiff was informed that a federal inmate could see a licensed professional for mental health issues only if he had been seeing a doctor on the outside and was on psychiatric medications (Id.. pp. 93-94).

23. Plaintiff was not on any medication when he was transferred to the Kankakee County Jail (Id., p. 94).

24. On July 27, 2005, plaintiff submitted his first sick call slip requesting to see the dentist because his gums were infected (Id., pp. 30-31).

25. Plaintiff was told by defendant Falgeole that an appointment with the dentist would be made, but that it would take four to eight weeks to see the dentist (Id., p. 30).

26. Defendant Flageole recommended to plaintiff that in the meantime he should gargle with Peroxyl after meals; plaintiff received the Peroxyl (Id., p. 31).

27. On August 12, 2005, plaintiff submitted a grievance to defendant Downey complaining he had a gum infection and could not wait until October, the two months he was told it could take to get an appointment, to see the dentist (Id., para. 2).

28. Defendant Downey contacted defendant Flageole to inquire about plaintiff's dentist appointment and was informed by defendant Flageole that an appointment had been scheduled for earlier than October (Id.).

29. On August 15, 2005, Defendant Downey responded to plaintiff's grievance and informed him that a dentist appointment had been scheduled for earlier than October and, due to security reasons, the jail would not divulge the exact date (Id. Ex. E, Moralis Dep., p. 36)
30. On August 31, 2005, plaintiff was examined by a dentist, Dr. John Peterson (Ex. E, Moralis Dep., p. 39; Ex. G, Peterson Dep., p. 8; Peterson's Answers Pl.'s Sec. Questions, No. 5).
31. Dr. Peterson had an x-ray taken of the tooth plaintiff complained about and subsequently offered to extract it (Ex. E, Moralis Dep., p. 40; Ex. G., Peterson Dep., p. 8).
32. Plaintiff was informed that the US Marshals would not pay for a root canal on the tooth, but that they would pay for an extraction; plaintiff refused the extraction (Ex. E, Moralis Dep., pp. 51-52).
33. On October 3, 2005, plaintiff again submitted a sick call slip requesting to see the dentist, complaining that his gums would bleed when he ate or brushed his teeth. (Id., p. 41).
34. An appointment with the dentist was arranged and plaintiff was provided with a bottle of Peroxyl mouthwash with which to gargle in the meantime (Id., pp. 43-44, 47).
35. Plaintiff was again treated by Dr. Peterson on October 21, 2005. Dr. Peterson conducted a visual examination and determined that plaintiff exhibited symptoms of periodontal disease due to years of neglect and deficient oral hygiene (Id., p. 48; Ex. G, Peterson Dep., p. 5; Ex. H, Peterson's Answers Pl.'s Sec. Questions, No. 21).
36. Periodontal disease does not usually require emergency treatment (Ex. G, Peterson Dep., pp. 11-12).
37. Periodontal disease is a chronic condition. It is a low grade infection that is present all the time but is usually not painful (Id., p. 12).
38. People with periodontal disease may experience some pain if food debris collects in the periodontal pockets (Id., pp. 11, 19).
39. Plaintiff's periodontal disease did not appear to be "terribly bad" and Dr. Peterson did not believe that it had progressed to the terminal stage (Id., pp. 11,20).
40. Great suffering is not generally associated with periodontal disease (Id., p. 12).
41. Periodontal treatment can range anywhere from tooth cleaning, scaling and root cleaning which is a real deep cleaning and periodontal surgery (Id. p. 13). Periodontal surgery is "a pretty extensive treatment" (Id., p 14). Dr. Peterson recommended[2] that plaintiff needed to receive at least scaling, root cleaning and deep cleaning underneath the root line (Id. p. 14).
42. If Moralis's periodontal disease was left untreated, he would have continued deterioration of periodontal tissues (Id., p. 11-12; Peterson's Answer to Plaintiff's Questions, No. 9, Ex. H). In the long term, teeth will eventually get loose and occasionally there can be pain if food debris gets down in one of the periodontal pockets (Id., p. 11).

---

[2]Defendants defined Dr. Patterson's recommendation as a suggestion. However, in response to the Defendants' question, "What sort of treatment did you think – at that time when you saw Mr. Moralis, what is the treatment that you think he needed at that time on October 31st?', Dr. Patterson stated "Probably to have had at least scaling and root cleaning, the deep cleaning underneath the root line." See Dr. Patterson's Deposition, p 14, lines 8-14. See also defendants' question (Id. p. 13, lines 17-19) "Okay, here [in plaintiff's case] you recommend periodontal treatment. What exactly is periodontal treatment?"

43. Dr. Peterson did not indicate to the USMS that plaintiff's periodontal disease, if left untreated until the resolution of his criminal status, would cause a deterioration of his health or uncontrolled suffering (Ex. C, Shaw Aff., para. 19). Dr. Peterson did not speak with either Flageole or Downey regarding Moralis (Ex. G, Peterson Dep., p. 17).
44. Dr. Peterson also recommended plaintiff rinse with Peridex, a chlorhexidine rinse, to ease his gum infection and maintain vigorous oral hygiene (Ex. G, Peterson Dep., p. 15).
45. Plaintiff received a bottle of Peroxyl, an antiseptic oral cleanser for removing debris and allowing healing, to rinse with at the Jail because Peroxyl is the named formulary used at the Jail (Ex. A, Flageole Aff., para. 4).
46. Plaintiff gargled with the Peroxyl, but continued to have problems (Ex. E, Moralis Dep., pp. 50-52).
47. Defendant Flageole subsequently ordered Peridex for plaintiff after he complained of continued gum pain and bleeding (Ex. A, Flageole Aff., para. 4).
48. Plaintiff received the Peridex and used it as directed; however, the Peridex did not help the swelling or pain in plaintiff's gums (Ex. E, Moralis Dep., p. 56).
49. Plaintiff was able to maintain good oral hygiene by brushing his teeth four times per day (Id., pp. 48-49).
50. Defendant Flegeole contacted Dr. Peterson's office and was informed that the procedure to treat periodontal disease would cost $620.00. Plaintiff was informed, because the USMS does not cover the cost of periodontal treatment, that if he wanted the procedure he would have to pay for it himself (Ex. A, Flageole Aff., para. 5).
51. On December 28, 2005, plaintiff submitted a request form to the medical department, informing the nurse that his gums were still bleeding and that one of his teeth appeared to be moving (Ex. E, Moralis Dep., p. 57).
52. On January 4, 2006, plaintiff submitted a grievance to defendant Downey complaining that his gums were bleeding badly and that his teeth were shifting, that defendant Falgeole was ignoring the dentist's prescribed treatment, that the disease was getting worse and he requested medical care (Id., pp. 69-70).
53. Plaintiff's complaint that defendant Flageole was ignoring the dentist's prescribed treatment plan consisted solely of the recommendation for periodontal treatment (Id., p. 70).
54. Defendant Downey contacted defendant Flegaeole and confirmed with her that the medical department was treating plaintiff as had been recommended by the dentist (Ex. B, Downey Aff., para. 3).
55. On January 9, 2006, plaintiff submitted a sick call slip requesting medical care because of trouble with depression, sleeping, loss of appetite, fatigue and mental pain (Ex. E, Moralis Dep., p. 97).
56. On January 10, 2006, plaintiff submitted a sick call slip requesting dental care for bleeding in his gums, gum disease and severe pain in gums (Id., pp. 79-80).
57. Plaintiff was told by defendant Flageole that a dentist appointment would be made when plaintiff had the money on the books for the periodontal treatment, as the USMS would not provide payment for the treatment (Id., p. 80).
58. On January 10, 2006, plaintiff was seen by Kristy Patterson, a Physician's Assistant contracted to provide health care services to inmates, for his mental health complaints and for his dental pain (Id., pp. 98-100; Patterson Aff., para. 1-2).

59. Plaintiff told P.A. Patterson that he was having problems with sleep, loss of appetite, memory loss, hopelessness and sadness (Ex. I, Patterson Aff., para. 2).
60. P.A. Patterson prescribed plaintiff Prozac, the brand name for Fluoxetine, which is a drug used to treat depression. Plaintiff received Prozac as prescribed (Id.; Ex. E, Moralis Dep., p. 101).
61. On January 11, 2006, plaintiff submitted a sick call slip requesting to see a clinical licensed psychologist to discuss his mental health problems; plaintiff was informed that he could not see a psychologist (Id., pp. 101-102).
62. On January 19, 2006, after receiving a number of grievances from plaintiff, defendant Downey responded to all of the grievances in the form of a letter (Ex. B, Downey Aff., para. 4).
63. In the letter, defendant Downey informed plaintiff of the name of the health care provider for the jail, that the jail does not make copies of medical files, that the medical department responds to grievances regarding medical care due to HIPPA guidelines, that the medical department was following the dentist's recommended treatment plan, that the U.S. Marshals Service does not provide for the periodontal treatment plaintiff was requesting and that plaintiff must submit a medical request form if he had mental health concerns (Id.).
64. Defendant Downey also informed plaintiff that if he had any concerns about his rights while housed in the jail, he should contact Supervising Deputy Christopher Shaw, U.S. Marshal (Id.).
65. On January 25, 2006, defendant Downey received a grievance signed by plaintiff requesting a meeting with him (Downey) to discuss plaintiff's dental and mental health issues (Id., para. 5).
66. In response to the grievance, defendant Downey contacted U.S. Marshal Shaw to discuss plaintiff's requests and complaints (Id.).
67. Defendant Downey, who had contacted Marshal Shaw regarding plaintiff's dental and mental health issues in a similar fashion on a number of other occasions, was informed that the treatment plaintiff was receiving at the Kankakee County Jail was appropriate according to the U.S. Marshal Service medical guidelines (Id.).
68. Subsequently, U.S. Marshal Shaw contacted plaintiff and discussed with him plaintiff's dental and mental health complaints and treatment (Id., Ex. E, Moralis Dep., p. 120).
69. On January 28, 2006, plaintiff submitted a medical request stating that his gums were swollen, bleeding and painful and requested pain medication (Ex. E, Moralis Dep., pp. 81-82).
70. Beginning on January 29, 2006, plaintiff was provided with Motrin for his pain (Id., pp. 83, 85; Ex. A, Flageole Aff., para. 5).
71. On February, 4, 2006, plaintiff submitted a sick call slip complaining of pain in his gums, a gum infection, severe bleeding of gums and apparent moving of teeth; plaintiff requested treatment by a dentist (Ex. E, Moralis Dep., p. 86).
72. Sometime in February of 2006, plaintiff claims that he attempted suicide by cutting his wrists (Id., p. 17).
73. Plaintiff did not tell defendant Flageole that he attempted to commit suicide nor did he submit a medical request or sick call slip for treatment as a result of any injuries sustained during the alleged suicide attempt. (Id., p. 21; Ex. A, Flageole Aff., para. 8).

74. On February 7, 2006, plaintiff was seen by P.A. Patterson for a follow-up appointment for his mental health and dental care (Ex. E, Moralis Dep., pp. 104-105; Ex. I, Patterson Aff., para. 3).
75. Plaintiff told P.A. Patterson that he was sleeping a little bit better, but that he was still anxious, sad and tired all the time. Plaintiff did not tell P.A. Patterson that he had attempted suicide or that he was suicidal (Ex. I, Patterson Aff., para. 3,5).
76. Patterson continued plaintiff's prescription for Prozac and increased the dosage from 20 milligrams to 40 milligrams; plaintiff received the higher dosage of Prozac as prescribed (Id.; Ex. E, Moralis Dep., p. 104).
77. Plaintiff also discussed his dental issues with Patterson and told her that his gums would bleed when he brushed his teeth and when he would eat (Id., p. 105).
78. Patterson examined plaintiff's gums and found that plaintiff's gingiva were pink with a mild edema but that they were not bleeding and had no abscess (Ex. I, Patterson Aff., para. 3).
79. P.A. Patterson prescribed plaintiff Doxycycline, a drug used to help treat periodontal disease by preventing the growth of bacteria; plaintiff received the Doxycycline as prescribed (Id.; Ex. E, Moralis Dep., 106).
80. On February 22, 2006, plaintiff submitted a sick call slip requesting pain pills because he did not have the money to purchase them off the commissary (Id., p. 87).
81. On February 23, 2006, defendant Flageole provided to plaintiff a bottle of Motrin for his pain (Ex. A, Flageole Aff., para. 6).
82. On March 3, 2006, defendant Downey received a grievance from plaintiff complaining that the nurse had ignored his medical requests and asked defendant Downey to take remedial action (Ex. B, Downey Aff., para. 6).
83. Defendant Downey contacted defendant Flageole and was advised that plaintiff's requests had been forwarded on to the doctor and that plaintiff had been seen for his mental health issues (Id.).
84. On March 7, 2006, plaintiff was seen by P.A. Patterson for a follow-up appointment for his mental health and dental care (Ex. E, Moralis Dep., pp. 107-108; Ex. I, Patterson Aff., para. 4).
85. Plaintiff told P.A. Patterson that he felt better on the 20 milligram dosage of Prozac and did not see any clear improvement with the 40 milligram does. Patterson continued plaintiff's prescription for Prozac, but lowered the dosage back to 20 milligrams (Ex. I, Patterson Aff., para. 4; Ex. E, Moralis Dep., p. 108).
86. Plaintiff did not tell P.A. Patterson during his treatment on March 7, 2006, that he had attempted to commit suicide or that he was suicidal (Ex. I, Patterson Aff., para. 5).
87. Plaintiff told Patterson that he did not notice any significant improvement with the Doxycycline but that he wanted to continue the treatment. Patterson continued the prescription for Doxycycline for plaintiff's periodontal disease and also prescribed Naproxen, an anti-inflammatory drug used to relieve dental pain and swelling (Id., para. 4; Ex. E, Moralis Dep., p. 108).
88. Plaintiff was transferred to the Metropolitan Correctional Center in Chicago, Illinois, on March 10, 2006 (Ex. E, Moralis Dep., pp. 6-7).

**Background**

At the outset, the court notes that the constitutional rights of a pretrial detainee are derived from the Due Process Clause of the Fourteenth Amendment and are distinguishable from an inmate's right not to be subjected to cruel and unusual punishment under the Eighth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Pursuant to constitutional requirements, a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell,* 441 U.S. at 535, 99 S.Ct. 1861. Therefore, when assessing the constitutionality of the conditions or restrictions of pretrial detention, it must be determined whether the conditions allegedly encountered by the detainee amounted to punishment. *Id.* at 536-37, 99 S.Ct. 1861; *accord Antonelli v. Sheahan,* 81 F.3d 1422, 1427 (7th Cir.1996). However, the Seventh Circuit Court of Appeals has made clear on a number of occasions, the mere fact that pretrial detention interferes with a person's desire to live comfortably and free from restraint does not, without more, make the conditions of that confinement unconstitutional. *See, e.g., Rapier v. Harris,* 172 F.3d 999, 1003 (7th Cir.1999); *Tesch v. County of Green Lake,* 157 F.3d 465, 476 (7th Cir.1998). Rather, conditions of confinement which are "reasonably related to a legitimate and non-punitive government goal," are not unconstitutional, *Antonelli,* 81 F.3d at 1427-28 (citing *Bell,* 441 U.S. at 539, 99 S.Ct. 1861), and courts will give a high degree of deference to the discretion of prison administration to "adopt policies and practices to maintain the safety and security of this country's penitentiaries." *United States v. Tokash,* 282 F.3d 962, 970 (7th Cir.2001); *see Bell,* 441 U.S. at 548, 99 S.Ct. 1861.

Although the Eighth Amendment does not apply to pretrial detainees, pretrial detainees are entitled to *at least* as much protection as the constitution provides convicted prisoners. *See Cavalieri v. Shepard,* 321 F.3d 616, 620 (7th Cir.2003). The Eighth Amendment protects an inmate from a governmental actor's "deliberate indifference to his basic needs." *Id.* at 620. Under this standard, conduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner, *i.e.,* "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.' " *Armstrong v. Squadrito,* 152 F.3d 564, 577 (7th Cir.1998) (quoting *West v. Waymire,* 114 F.3d 646, 651 (7th Cir.1997)). In *Armstrong,* the Court noted that "[u]nder other constitutional provisions [such as the Fourteenth Amendment] ... the standard for deliberate indifference appears closer to tort recklessness." *Id.* In recognition of this, the Court has articulated the test for deliberate indifference for Fourteenth Amendment purposes to be "a conscious disregard of known or obvious dangers." *Armstrong,* 152 F.3d at 577 (quoting *West,* 114 F.3d at 651). However, considering "the difficulty of peering into minds [of government officials or institutions]," this distinction is of little significance in practical application. *West,* 114 F.3d at 651. Thus, the Court has found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) "without differentiation." *Henderson v. Sheahan,* 196 F.3d 839, 845 n. 2 (7th Cir.1999); *See Higgins v. Correctional Med. Servs. of Illinois, Inc.,* 178 F.3d 508, 511 (7th Cir.1999); *see also Mathis v. Fairman,* 120 F.3d 88, 91 (7th Cir.1997).

The Eighth Amendment protects a detainee not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health. *Henderson,* 196 F.3d at 846-47 (citing *Helling v. McKinney,* 509 U.S. 25, 33-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). Deliberate

13

indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)( medical need that has been diagnosed by a physician as mandating treatment is a serious medical need). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373. The subjective component (deliberate indifference) does not encompass negligence or even gross negligence. *Id.*, *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811. A prisoner is not required to show that he or she was "literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)(jury could find deliberate indifference, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell."). Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances."). However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A prison doctor's decision not to follow an outside specialist's recommendations may, however, raise an inference of deliberate indifference. *Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004).

First, this court notes this circuit's view that "dental care is one of the most important medical needs of inmates." *See Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir.2001)(quoting *Ramos v. Lamm,* 639 F.2d 559, 576 (10th Cir.1980)). In addition, a number of other courts have also held that dental pain accompanied by various degrees of attenuated medical harm may constitute an objectively serious medical need. *See Fields v. Gander,* 734 F.2d 1313, 1314-15 (8th Cir.1984); *see also Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996) (recession or bleeding of the gums); *Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (deterioration of teeth due to lack of treatment); *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989)(an interference with

14

the ability to eat). For example, in *Penrod v. Zavaras,* the United States Court of Appeals for the Tenth Circuit held that, for summary judgment purposes, the deprivation of toothpaste resulting in bleeding gums and tooth decay which had to be attended to by a dentist could constitute serious harm under the Eighth Amendment. *Penrod,* 94 F.3d at 1406.

The Seventh Circuit has recognized that periodontal disease is a serious medical condition. In *Board v. Farnham*, 394 F.3d 469, 480 (7th Cir 2005), in a footnote, the Court noted the following:

> The risks posed by tooth loss, the most common cause of which is periodontal disease (of which the most common form is known as gingivitis), cannot be underestimated. Such diseases of the mouth are believed to sometimes contribute to coronary atherosclerosis and a myriad of heart problems, as well as bacterial infections such as transient bacteremia or sepsis, all of which are capable of causing death. See Eugene Buaunwald, et al., Harrison's Principles of Internal Medicine 194-95, 799-800 (15th ed.2001).

The defendants argue that existing precedent would not have put them on notice that their failure to provide plaintiff with periodontal treatment which was not authorized by the United States Marshall Service violated Moralis's constitutional rights. The Defendants point to the USMS and assert that the USMS would not authorize the treatment for Moralis's periodontal diseases. U. S. Marshal Chris Shaw testified in his affidavit that "treatment of pre-existing conditions, which are not life-threatening or medically necessary, should be delayed until after the prisoner's judicial status is resolved . According to USMS Publication 100, periodontal treatment is not authorized for payment the USMS." Defendants argue that while the deliberate indifference standard is well established, there is no Seventh Circuit precedent discussing the constitutional duty of a local county jail to provide specific treatment not authorized under the USMS medical guidelines to a federal inmate housed in the jail. However, a clearly established right may be found, in the absence of precedent, when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." "[D]ental care is one of the most important medical needs of inmates." *See Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir.2001).

Here, the Plaintiff, a pre-trial detainee at the Kankakee County Jail, suffered from dental gum infections, pain and bleeding gums from July 27, 2005 and was still suffering when he was transferred from the Kankakee County Jail to Metropolitan Center in March 2006. On July 27, 2005, the plaintiff submitted his first sick call slip requesting to see the dentist because his gums were infected. Flageole arranged an appointment with Dr. Peterson for the plaintiff for October 2005. On August 12, 2005, the plaintiff grieved to Downey complaining that he a gum infection and could not wait two months to see the dentist. Downey then contacted Flageole and subsequently, she was able to get an earlier appointment for the plaintiff. On August 31, 2005, the plaintiff was examined by a dentist, Dr. John Peterson, who had an x-ray taken of the tooth plaintiff complained about and subsequently offered to extract it. The plaintiff refused the extraction. On October 3, 2005, approximately five weeks later, plaintiff again submitted a sick

call slip requesting to see the dentist, complaining that his gums would bleed when he ate or brushed his teeth. Another appointment was made with the dentist and in the meantime, Flageole provided the plaintiff with a bottle of Peroxyl mouthwash with which to gargle.

On October 21, 2005, Dr. Peterson diagnosed the plaintiff with periodontal disease. Dr. Peterson recommended that the plaintiff receive at least scaling, root cleaning and deep cleaning underneath the root line. The dentists also recommended Peridex, a chlorhexidine rinse, to ease the plaintiff's gum infection and vigorous oral hygiene. The plaintiff received Peroxyl, an antiseptic oral cleanser for removing debris and allowing healing. Plaintiff gargled with the Peroxyl, but continued to have problems. Flageole then ordered Peridex after he complained of continued gum pain and bleeding. Although the plaintiff used the Peridex as directed, it did not help the swelling or pin in his gums. Flageol contacted Dr. Peterson's office and was advised the procedure to treat the plaintiff's periodontal disease would cost $620. She advised the plaintiff that because USMS does not cover the costs of periodontal treatment, that if he wanted the procedure he would have to pay for it himself.

On December 28, 2006, plaintiff through a request form, advised the medical department that his gums were still bleeding and one of his teeth appeared to be moving. On January 4, 2006, the plaintiff, through a grievance, advised Downey that his gums were bleeding badly and his teeth were shifting. He also advised Downey that Flageole was not providing the recommendation for periodontal treatment prescribed by the dentist and that his periodontal disease was getting worse. He also requested medical care. Downey contacted Flageole and confirmed with her that the medical department was treating the plaintiff as had been recommended by the dentist. On January 10, 2006, plaintiff submitted a sick call slip requesting dental care for bleeding in his gums, gum disease and severe pain in his gums. In response, Flagole advised the plaintiff that a dentist appointment would be made when he had the money on the books (in his trust fund at the jail) for the periodontal treatment. On January 10, 2006, the plaintiff complained to Kristy Patterson, a physician assistant abut his dental pain.

On January 19, 2006, after received several grievances from the plaintiff, Downey, in his response advised the plaintiff that the medical department was following the dentist's recommended treatment plan and that USMS does not provide for the periodontal treatment (recommended by the dentist) the plaintiff was requesting. After receiving a grievance on January 25, 2006, wherein the plaintiff requested a meeting with him, Downey contact U. S. Marshal Chris Shaw to discuss the plaintiff's requests and complaint. This was not the first occasion that Downey had contacted Shaw about the plaintiff's medical concerns. On January 25, 2006 and the other occasions, Shaw informed Downey that the treatment plaintiff was receiving at the jail was appropriate according to the U. S. Marshal Service medical guidelines.

However, in his affidavit, Chris affies that the USMS relies on the medical assessment of the local jail's physicians to determine whether a detainee is in need of medical attention ... whether the treatment can be postponed until the resolution of the detainee's criminal proceeding, and whether the treatment can be provided within the jail. Chris also affies that when a local jail determines that a federal detainee may be in need of non-emergency medical care that cannot be provided within the jail and the treatment cannot be reasonably postponed until disposition of the

detainee's criminal matter, the local jail contacts the USMC district offices for authorization. Most important is the fact that the defendants recognize that an otherwise non-authorized treatment can be approved when an evaluating physician determines that a prisoner's condition would cause deterioration of his or her health or uncontrolled suffering if left untreated while in USMS custody.  So how does a local jail determine whether a federal detainee may be in need of non-emergency medical care that cannot be reasonably postponed until disposition of the detainee's criminal matter.  How does one do that when after an October 21, 2005, the physician had not specifically advised that plaintiff's treatment could not be reasonably postponed and that if the condition was left untreated, it would cause deterioration of his health or uncontrolled suffering, and when the detainee over the next four to five months is complaining constantly about his dental problems?  Ask the physician.  Here, both defendants were aware of the plaintiff's months of suffering and the deterioration of his condition.  Defendants assert in their statement of facts that Dr. Peterson did not indicate to them or USMS that plaintiff's periodontal disease, if left untreated until the resolution of his criminal status, would cause a deterioration of his health or uncontrolled suffering.  Neither defendant, even with knowledge that plaintiff's condition was deteriorating to the point that his teeth were moving, bothered to pick up the phone, call Dr. Peterson to ask if the plaintiff's condition was left untreated until the resolution of his criminal status, would it cause a deterioration of his health or uncontrolled suffering, or if necessary, take the plaintiff to the dentist for a follow-up visit so the dentist could make that determination.   Even without making that call or follow-up visit, both defendants were aware, through the plaintiff numerous visits to the medical department, numerous complaints and grievances that he was complaining that his dental condition was both painful, getting worse and in all probability, severely impacting Moralis's health.

A call was made to the dentist office by Flageole to see what the cost would be for the recommended periodontal treatment.  The plaintiff was advised that when he got the $620.00, he could have the treatment.  The defendants approved the treatment for the periodontal disease conditioned on the plaintiff having the funds to pay for the treatment.  The defendants advised the plaintiff that the treatment would only be available at his own expense.  If a prisoner is able to pay for medical care, requiring such payment is not deliberate indifference to serious medical needs.  *Helling v. McKinney*, 509 U. S. 25, 32, 113 S.Ct. 2475, 2480 (1973).   Instead, such a requirement simply represents an insistence that the prisoner bear a personal expense that he or she can meet and would be required to meet in the outside world. *See, e.g., Shapley v. Nevada Bd. of State Prison Commissioners,* 766 F.2d 404, 408 (9th Cir.1985) (nothing per se unconstitutional about charging an inmate $3 for every medical visit; such a charge, by itself, did not constitute deliberate indifference under *Estelle*).  However, a prison official who withholds necessary medical care, for want of payment, from an inmate who could not pay would violate the inmate's constitutional rights if the inmate's medical needs were serious, because refusal to act pending the impossible is no different from refusing without qualification.  *Martin v. DeBruyn*, 880 F.Supp. 610, 615 (N.D.Ind.1995), aff'd, 116 F.3d 1482 (7 th Cir.1997).  As an indigent detainee, Moralis was unable to pay for the dental services.

Despite the plaintiff's continuous and persistent complaints and Dr. Peterson's recommendation that plaintiff receive at least scaling, root cleaning and deep cleaning underneath the root, the defendants provided Moralis with only pain pills, anti-biotics and dental rinses.  A

17

jury could find that the defendants have caused Moralis to suffer long-standing, serious dental problems without offering anything more than pills and various dental rinses. The defendants cannot simply escape their duty to provide dental care to those detained in their jail by asserting USMS does not authorize the treatment. The defendants had the option of contacting the physician and asking him to make the proper determination for the particular detainee. Moralis's right to have his dental needs attended to was clearly established in precedent law at the time of the alleged violation. The law is clear that deliberate indifference to a serious medical condition is a violation of a clearly established constitutional right. *See, e.g., Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir.2002). In addition, a reasonable person in the defendants' position should or would have understood they were violating Moralis's constitutional rights to adequate medical treatment by denying the recommended treatment if it could not be postponed until the resolution of his criminal proceeding, without causing deterioration of his health and uncontrolled suffering. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038 (1987) on the application of qualified immunity. With respect to how particularized the "clearly established" right must be, the Supreme Court stated that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, … but it is to say that in light of pre-existing law the unlawfulness must be apparent. *Id.* at 640. The jail official only need "fair warning" that his/her actions were unconstitutional. *Hope v. Pelzer,* 536 U.S. 259, 271, 117 S.Ct. 1219, 137 L. Ed.2d 432 (1997). The court finds the defendants are not entitled to qualified immunity on this claim. Viewing the facts in the light most favorable to Moraliss, the court must deny the defendants' summary judgment motion on the plaintiff's claim that he was denied adequate dental care for his serious medical needs.

As to the plaintiff's claim that the defendants denied him adequate mental health care, when they denied his request for a qualified or licensed psychologist, the defendants are entitled to summary judgment. The plaintiff may have desired treatment by a licensed clinical psychologist. However, with the facts before this court, the Constitution does not mandate that plaintiff receive such treatment. An inmate is not entitled to demand specific care nor is he entitled to the best possible care. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, an inmate is entitled to reasonable measures. *See id.* Here, the record shows that Plaintiff's requests for mental health care were forwarded to the doctors and that plaintiff was subsequently treated for his concerns with his mental problems by P.A. Patterson on numerous occasions. Plaintiff's difference of opinion as to how he should have been treated does not give rise to a constitutional violation. *See Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001).

It is ordered:

1. As the clerk of the court filed the plaintiff's amended pleadings [227 and 229] on February 26, 2007, the plaintiff's motion for leave to file an amended summary judgment pleading [228] is rendered moot.
2. Pursuant to Fed. Rule Civ. Pro. Rule 56 and L. R. 7.1(D), the clerk of the court is directed to strike the plaintiff's responses: [216] plaintiff's declaration [217] plaintiff's additional summary judgment issues [218], plaintiff's additional summary judgment exhibits [219],

      plaintiff's counterstatement [220], plaintiff's additional information [221], plaintiff's medical exhibits/summary judgment [222], plaintiff's affidavit [223], plaintiff's memorandum of law [224], plaintiff's declaration in opposition [227], and the plaintiff's amended counterstatement [229] to defendants' summary judgment motion, forthwith.
3.   Pursuant to Fed. R. Civ. Pro. Rule 56(c), the defendants' summary judgment motion is granted in part and denied in part. The defendants are granted summary judgment on the plaintiff's claim that the defendants denied him adequate mental health care. The defendants are denied summary judgment on the plaintiff's claim that the defendants' denied him adequate medical care for his dental problems.
4.   The court welcomes a well supported summary judgment motion on the remaining claim, within 21 days of this order. The clerk of the court is directed to set a deadline. If such a motion is not filed within the specified time, the court will set this case for a jury trial on the remaining claim.

Enter this 28th day of September 2007.

                              /s/ Michael P. McCuskey
                          _____
                                  Michael P. McCuskey
                              Chief United States District Judge